SOMMERVILLE, J.
Plaintiff sues for damages ex contractu in the sum of $6,875, with interest from judicial demand, because of the violation of a written contract entered into Between it and the defendant company for 500 bales of linters at 3 cents per pound, *721 to be delivered during tbe months of October, .1915, to February, 1916; tbe contract being dated June 29, 1915, and it was entered into with J. W. Yogler tbe alleged manager, duly authorized, of tbe defendant company.
Tbe defendant company answered, admitting tbe execution of the contract referred to in plaintiff’s petition, “signed by Capital City Oil Company, J. W. Yogler, Manager”; but defendant specially denied that said Yogler was authorized in any manner to bind defendant by such an agreement, or that same constituted a contract valid and binding on the company. It also admitted that plaintiff had made demand for the fulfillment of the contract and that defendant refused to comply therewith. Further answering, defendant—
“admits the correctness of the mathematical computation with reference to the alleged loss of defendant in paragraph 7 of plaintiff’s petition.”
Further answering, defendant alleged:
“That this suit is based upon an alleged contract represented by plaintiff to have been entered into between the E. I. Dn Pont de Nemours Powder Company on the one'part, and defendant company, represented by J. W. Vog-ler, manager, on the other, whereby defendant sold to the said first party 500 bales of lintors at 3 cents per pound, to be delivered for shipment in lots of 50 bales each during the months of October1, 1915, to February, 1916. Now, defendant represents that the said Yogler had no authority or power whatsoever, either expressed or implied, to represent this company in such transaction, or to bind the company to the performance of such alleged contract.
“Defendant, further answering, represents that on the said 29th day of June, 1915, this company was operating under the provision of Act No. 267 of the Legislature of the state of Louisiana for the year 1914, commonly known as the ‘Uniform Corporation Law’; that section 15 of said act, among other provisions, contains the following: ‘They [i. e. the directors] may appoint other agents and employes, who shall, respectively, have such power and perform such duties as may be prescribed by the by-laws, and who may be removed at the pleasure of the directors ;’ that neither prior to the passage of said act nor since has this company by its bylaws prescribed the powers or duties of its manager, and the manager of this company was therefore without express authority to bind this company by any contract, and particularly a contract such as plaintiff seeks to enforce by this suit. * * *
“Defendant further -represents, however, that said Yogler did not possess even implied authority to bind this company by said transaction. Defendant company is not a speculative, but a manufacturing, company, authorized only to sell its manufactured products. The pretended contract was not only out of the usual and normal course of the business of this company, but was extraordinary in itself, highly speculative, and attempted to be made at a time when abnormal conditions existed and the market rendered hazardous and extremely unsafe by a general European war, which unsettled conditions throughout the world. The contract purported to bind this company, months in advance of the company’s business season, to the sale and delivery of a commodity to the extent of more than double the season’s output of defendant’s mill; a contract to fill which would have necessitated this company, at a ruinous loss, to go out upon a speculative market largely, if not wholly, controlled by the plaintiff and associated companies, and buy the commodity called for in this contract in excess of the output of its mill. The business of this company, as shown by its charter, is the manufacturing of cotton seed products and the marketing of same after they have been produced and are ready for market; and the E. I. Du Pont de Nemours Powder Company had no right to assume that the manager of the defendant company, in negotiating such a contract, was acting within the authoritative scope of his duties. * * *
“Defendant further represents that had this company ‘entered into said contract, which it denies, such contract would have been ultra vires, null, and void, as beyond the competency of the board of directors to bind it,” etc.
Tbe answer was sworn to by tbe president of tbe defendant company, and on tbe trial he testified in support of tbe allegations therein contained, and there was judgment in favor of the defendant, rejecting plaintiff’s demand at its costs. Plaintiff appealed.
The defendant company was organized to—
“own and operate mills for the manufacture of cotton seed oil and for the manufacture of cotton seed into all of its various commercial products, to manufacture fertilizer and to feed cattle, to acquire and operate gins, and to do *723 everything pertinent to the conduct of such business as the needs and purposes of said corporation may require.”
It manufactured and sold cotton seed meal, oil, cates, and linters. Linters were the subject of the contract sued upon. In the season of 1912-13 there were manufactured and sold by defendant 258 bales; in the season of 1913-14, 417 bales; in the season of 1914-15, 398 bales; and in the season of 1915-16, 207 bales. Por the year preceding the date of the contract the defendant company had manufactured and sold 398 bales of linters, and during the season before that 417 bales; and it was not unreasonable on the part of the general manager to suppose that during the season of 1915-16 the mill would manufacture the 500 bales which defendant had contracted to deliver to plaintiff. The contract therefore had not the appearance of being speculative, or out of the usual and ordinary course of the business of the defendant company; nor can it be said to have been extraordinary, and made at a time when abnormal conditions existed because of the European war. The number of bales was.not, as related in defendant’s answer, double that season’s output of its mill. It was altogether reasonable for the general manager to suppose that the mill would do better during the season then approaching than it had done theretofore. And he testified that he expected the mill to produce more linters than it had done in previous years.
The record shows that Vogler was the vice president of the defendant company; that he was elected manager of defendant’s mill; that he was placed in charge of the plant in Baton Rouge, at the domicile of defendant; that he transacted the business of the company; and that the duties of the manager were not defined by the board of directors. Vogler received and opened the mail addressed to defendant, made all contracts, and managed the business ■ generally. He was in full charge of the mill of defendant, and defendant held him out to the world as its representative and general manager.
The proposition of plaintiff to buy 500 bales of linters was contained in a letter addressed to the Capital City Oil Company at Baton Rouge, which letter was opened and answered by Vogler.
The contract is in writing on the letter paper of the “Capital City Oil Company,” with J. W. Vogler named at the head vice president and manager of the company.
The evidence shows that Mr. Vogler was intrusted with the full management of all the affairs of the company, and that there was no other person attending to the daily business of the company except the president, who resided in New Orleans and attended to larger financial affairs.
The evidence shows that in the operating of cotton seed oil mills the manager is ordinarily intrusted with the affairs of the concern, just as Mr. Vogler was intrusted with defendant’s business.
Defendant’s witnesses testified that linters were a by-product, and not one of the products mentioned in the charter. They were a regular product, and they produced revenue for the company. Such product was a regular one of the mill, and it was counte'd upon by the defendant company with which Vogler was charged with the management.
[1 ] After holding Mr. Vogler out as manager of the mill, defendant cannot say he was acting without authority in the premises. And Mr. Vogler testified as a witness that the business of the defendant was to buy seed and manufacture .it into products that were ordinarily obtained from seed and to sell the products; that he entered into the contract sued upon as an ordinary business affair of defendant; and that he had expected, up to the middle of September, to get enough seed to fill the contract he had entered into with plaintiff, but at that time, due to the ravages of the boll weevil, the seed supply was grow *725 ing limited, and he began to fear that lie would not be able to’ fill the contract. He further testified:
“There was not anything unusual as far as my management of this mill is concerned, because I have not been used to being manager of this company; in a manner, it was unusual, because I did not have the seed on hand to make the linters from. * * * It never was out of the course of my duties to sell these products with any other mill as manager for an oil company. I considered that when I became manager I was authorized to do that which I did. It seems to me that whenever somebody is appointed manager of an oil mill that authority to sell linters is implied by the appointment to be manager. There are no unusual conditions under which that contract was made that I can see. I had no specific authority from the board • of directors or the president to make this contract, because I considered it part of my duties as manager.”
In these regards the witness is corroborated by other witnesses with reference to the management of other mills, to the effect that the general manager of a cotton seed oil mill has the authority to dispose of the products of the mill, including linters. And the evidence is that it was customary to sell the products in advance of their actual production, as was done in this case.
The defendant denied that it had a contract with the plaintiff to deliver 500 bales of linters of 500 pounds each, at the same time admitting, through its president, in a letter by him to Mr. Vogler, the general manager, that there was such a contract. The president proposed in that letter a method by which defendant might reduce the amount of linters to be delivered to plaintiff, and to reap a benefit from the advanced price in the sale of linters. He wrote:
“We can give the matter further consideration as to whether or not we wifi have to execute contract for 500 bales which you have with the Du Pont Powder Company, but, in the meantime, I would strongly advise you to put up your linters in bales of about 360 to 375 pounds. By this method we could deliver smaller quantities of lint in the event that we executed the contract, and we would have a good fighting chance to defeat buyer in the event he would make a claim for short shipment.”
In that same letter the president of the company wrote to the general manager:
“It seems to me that your linter yield is very low, and you should make every effort to get more lint even if this is done at the expense of a smaller crush per day.”
So that, while linters may have been only a by-product of the mill, it was to the interest of the company, according to the letter of the president, because of the high prices then prevailing, to get more lint, even if that was to be done at the expense of a smaller crush per day.
[2] The evidence in the record is quite convincing that the contract was not an extraordinary one, or one out of the usual run of the affairs of the company, and that the general manager of the defendant company had the right to make the contract sued upon. It was to all appearances, when made, a contract greatly to the advantage of the defendant company, because the price offered by plaintiff was very much larger than linters had ever brought before, and because of the high prices prevailing the president urged the manager to make more linters at the expense of a smaller crush of seeds per day. The contract is legal and binding in all its parts, and plaintiff is entitled to the damages it seeks for a violation thereof.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed; and that there now be judgment in favor of plaintiff and against defendant, Capital City Oil Company, condemning it to pay to the E. I. Du Pont de Nemours & Co. the sum of $6,875, with interest from judicial demand, and for costs.